John J. Francis, Jr.
Michael C. Zogby
DRINKER BIDDLE & REATH LLP
*A Delaware Limited Liability Partnership*
500 Campus Drive
Florham Park, New Jersey 07932
(973) 360-1100
*Attorneys for Plaintiffs*
*Pfizer Inc., Warner-Lambert Company LLC,*
*Gödecke GmbH, and Pfizer Pharmaceuticals LLC*

Of Counsel:
Jack B. Blumenfeld
Karen Jacobs Louden
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Gabapentin Patent Litigation | ) MDL No. 1384 |
| _____ | ) Master Docket No. |
| | ) 00-CV-2931 (FSH) |
| | ) |
| | ) **This Filing Applies To:** |
| | ) <u>Teva Defendants</u> |
| | ) C.A. No. 00-CV-4168 (FSH) |
| | ) C.A. No. 00-CV-4589 (FSH) |
| | ) |
| | ) <u>IVAX Defendants</u> |
| | ) C.A. No. 00-CV-6073 (FSH) |
| | ) C.A. No. 01-CV-0193 (FSH) |
| | ) C.A. No. 01-CV-1537 (FSH) |
| | ) |
| | ) <u>Eon Defendants</u> |
| | ) C.A. No. 01-CV-2194 (FSH) |
| | ) |

## NOTICE OF MOTION TO STRIKE CERTAIN AFFIRMATIVE DEFENSES
## <u>OF TEVA, IVAX, AND EON DEFENDANTS</u>

TO:     ALL COUNSEL ON ATTACHED SERVICE LIST

PLEASE TAKE NOTICE that on October 6, 2008 at 9:30 a.m., or as soon thereafter as counsel may be heard, or at such other date and time as the Court may set, Plaintiffs shall move before the Honorable Faith S. Hochberg, United States District Judge, sitting at the United States Post Office & Courthouse, 50 Walnut Street, Newark, New Jersey, for an Order granting Plaintiffs' Motion to Strike Certain Affirmative Defenses of Teva, IVAX, and Eon Defendants, along with such other and further relief as the Court deems just and proper.

PLEASE TAKE FURTHER NOTICE that, in support of this motion, Plaintiffs will rely on the Memorandum of Law and Declaration of John J. Francis, Jr. submitted herewith.  A proposed Order accompanies this Motion.

PLEASE TAKE FURTHER NOTICE that Plaintiffs request oral argument if opposition is received.

Dated:  June 16, 2008

*/s/ John J. Francis, Jr.*
John J. Francis, Jr.
Michael C. Zogby
DRINKER BIDDLE & REATH LLP
*A Delaware Limited Liability Partnership*
500 Campus Drive
Florham Park, New Jersey 07932
Attorneys for Plaintiffs

OF COUNSEL

Jack B. Blumenfeld
Karen Jacobs Louden
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

2369521.1

John J. Francis, Jr.
Michael C. Zogby
DRINKER BIDDLE & REATH LLP
500 Campus Drive
Florham Park, New Jersey  07932
(973) 360-1100
  *Attorneys for Plaintiffs*
  *Pfizer Inc., Warner-Lambert Company LLC,*
  *Gödecke GmbH, and Pfizer Pharmaceuticals LLC*

Of Counsel:
Jack B. Blumenfeld
Karen Jacobs Louden
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re Gabapentin Patent Litigation | ) MDL No. 1384 |
| | ) Master Docket No. |
| _____ | ) 00-CV-2931 (FSH) |
| | ) |
| | ) **This Filing Applies To:** |
| | )    <u>Teva Defendants</u> |
| | )    C.A. No. 00-CV-4168 (FSH) |
| | )    C.A. No. 00-CV-4589 (FSH) |
| | ) |
| | )    <u>IVAX Defendants</u> |
| | )    C.A. No. 00-CV-6073 (FSH) |
| | )    C.A. No. 01-CV-0193 (FSH) |
| | )    C.A. No. 01-CV-1537 (FSH) |
| | ) |
| | )    <u>Eon Defendants</u> |
| | )    C.A. No. 01-CV-2194 (FSH) |

## PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR
## MOTION TO STRIKE CERTAIN AFFIRMATIVE DEFENSES
## <u>OF TEVA, IVAX, AND EON DEFENDANTS</u>

i.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... ii

PRELIMINARY STATEMENT ...............................................................1

ARGUMENT ...........................................................................................5

I.     THE APPLICABLE LEGAL STANDARDS......................................5

II.    DEFENDANTS' UNCLEAN HANDS AFFIRMATIVE
       DEFENSES SHOULD BE STRICKEN BECAUSE
       DEFENDANTS HAVE NOT ALLEGED ANY
       RELATIONSHIP BETWEEN THE ALLEGED
       MISCONDUCT BY W-L AND THE RELIEF SOUGHT IN
       THIS ACTION. ...................................................................................6

       A.     Teva's and IVAX's Unclean Hands Affirmative
              Defenses Should Be Stricken.....................................................6

       B.     Eon's Unclean Hands Affirmative Defense Should Be
              Stricken. ..................................................................................11

III.   TEVA AND IVAX HAVE FAILED TO ALLEGE AN
       AFFIRMATIVE DEFENSE OF PATENT MISUSE BECAUSE
       THEY HAVE NOT ALLEGED THAT ANY ACT BY W-L
       BROADENED THE PHYSICAL OR TEMPORAL SCOPE OF
       THE '482 PATENT. ..........................................................................12

CONCLUSION ......................................................................................17

ii.

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Aronson v. Quick Point Pencil Co.*,
　　440 U.S. 257 (1979)...........................................................................15

*B. Braun Medical v. Abbott Lab.*,
　　124 F.3d 1419 (Fed. Cir. 1997) .......................................................14

*Bell Atlantic Corp. v. Twombly*,
　　127 S.Ct. 1955 (2007)....................................................6, 10, 12, 14

*Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc.*,
　　747 F.2d 844 (3d Cir. 1984). .............................................................9

*Eisai Co., Ltd. v. Teva Pharmaceuticals USA, Inc.*,
　　2008 WL 877966 (D.N.J. Feb. 13, 2008) ..........................................5

*In Re New Valley Corp.*,
　　181 F.3d 517 (3d Cir. 1999) ....................................................7-8, 12

*Keystone Driller Co. v. General Excavator Co.*,
　　290 U.S. 240 (1933)...........................................................................8

*Magnivision, Inc. v. Bonneau Co.*,
　　115 F.3d 956 (Fed. Cir. 1997) .........................................................16

*Medpointe Healthcare Inc. v. Hi-Tech Pharmaceutical Co.*,
　　380 F. Supp. 2d 457 (D.N.J. 2005)...........................................8-9, 14

*Monsanto Co. v. McFarling*,
　　363 F.3d 1336 (Fed. Cir. 2004) .................................................14, 16

*Pfizer v. PurePac/Faulding*,
　　C.A. No. 98-2749 (JCL) (Dec. 27, 2000) (Transcript)...................9-10

*Phillips v. County of Allegheny*,
　　515 F.3d 224 (3d Cir. 2008) ...........................................................6, 8

*United States v. Acorn Tech. Fund, L.P.*,
 2006 WL 237506 (E.D. Pa. Jan. 31, 2006) ..........................................................5

*Virginia Panel Corp. v. Mac Panel Co.*,
 133 F.3d 860 (Fed. Cir. 1997) ...........................................................................15

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
 782 F.2d 995 (Fed. Cir. 1986) ...........................................................................13

**STATUTES**

21 U.S.C. § 355 .......................................................................................................4

**OTHER AUTHORITIES**

6 Donald S. Chisum, *Patents* § 14.03[3] (2007) ...................................................14

2 James Wm. Moore, *Moore's Federal Practice* § 12.37[4] (3d ed. 2007) .............5

**RULES**

Fed. R. Civ. P. 12 ...................................................................................................2

## PRELIMINARY STATEMENT

Plaintiffs Pfizer Inc., Warner-Lambert Company LLC, Gödecke GmbH, and Pfizer Pharmaceuticals LLC (collectively, "W-L") brought these patent infringement cases asserting that defendants Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd. (collectively, "Teva"); Zenith Laboratories, Inc. (now known as IVAX Pharmaceuticals NV, Inc.), Zenith Goldline Pharmaceuticals, Inc. (now known as IVAX Pharmaceuticals, Inc.), and IVAX Corp. (collectively, "IVAX"); and Eon Labs Manufacturing, Inc. (now known as Eon Labs, Inc.) and Sandoz, Inc. (collectively, "Eon," and together with Teva and IVAX, "Defendants") have infringed U.S. Patent No. 6,054,482 (the "'482 Patent") by their proposed (now actual) sale in the United States of generic versions of W-L's patented Neurontin® product.  Teva, IVAX, and Eon, along with the Purepac defendants, launched their generic gabapentin products at risk, before any court ruling on liability.

Now that the Federal Circuit has reversed the grant of summary judgment of non-infringement and Teva, IVAX, and Eon face potential liability for the damage they caused to W-L's Neurontin® product, Defendants assert affirmative defenses in their Answers to W-L's First Amended and Supplemental Complaints that have absolutely nothing to do with the infringement issue or the enforcement of the '482 Patent.  Defendants also ignore the fact that they have not

2.

been harmed but instead have profited handsomely from their at-risk launches. Under the circumstances, it is not surprising that none of these defenses are viable as a matter of law.

Specifically, all three Defendants assert affirmative defenses of unclean hands, which rest entirely upon their allegations about W-L's alleged "off-label marketing" of Neurontin®.  Yet, Defendants do not (and cannot) allege that W-L's marketing of Neurontin® had anything to do with W-L's enforcement of the '482 Patent in this litigation, much less allege that that marketing is "directly related" or "closed connected" to enforcement of the '482 Patent, as is required for unclean hands.  Teva and IVAX – but not Eon – also allege that W-L engaged in patent misuse by purportedly delaying the prosecution of the '482 Patent, but they do not (and cannot) allege that those activities altered the physical or temporal scope of the '482 Patent, an essential element of patent misuse, or that W-L improperly negotiated to extend its patent term.

The allegations of unclean hands and patent misuse are insufficient as a matter of law.  They should be stricken pursuant to Rule 12(f) to streamline the issues in these cases.

## BACKGROUND

W-L scientists discovered gabapentin in the 1970s, and obtained various patents covering gabapentin and certain uses of gabapentin.  W-L could not produce a viable commercial product, however, because it discovered that gabapentin could become unstable and convert to toxic gabapentin lactam.  Through further investigation, W-L determined that gabapentin products had to be essentially free from mineral acid impurities, and that certain adjuvants that can promote conversion of gabapentin to its corresponding lactam should be avoided.  W-L applied for a U.S. patent on these inventions in 1990.

In late 1994, the Patent Office issued a notice of allowance of the 1990 application, setting an issue date in March 1995.  In January 1995, however, W-L withdrew the application and filed a continuation application in order to specifically cite prior art U.S. Patent No. 4,152,326 (the "'326 Patent") to the examiner.  Teva Ans. at ¶¶ 68-69; IVAX Ans. at ¶¶ 67-68.[1]  After five more years of prosecution, the '482 Patent issued in April 2000.  Teva Ans. at ¶ 14; IVAX Ans. at ¶ 15; Eon Ans. at ¶ 13.

---

[1]     The Answers of Teva, IVAX, and Eon to W-L's First Amended and Supplemental Complaint will be referred to as "Teva Ans.," "IVAX Ans.," and "Eon Ans.," respectively.

4.

Based on its discoveries, W-L developed its Neurontin® product. Following clinical trials, W-L submitted to the FDA its first New Drug Application ("NDA"), NDA No. 20-235, covering Neurontin® capsules, and NDA No. 20-882, covering Neurontin® tablets. Teva Ans. at ¶ 20; IVAX Ans. at ¶ 21. W-L's first NDA was approved by the FDA in December 1993 (Teva Ans. at ¶ 47; IVAX Ans. at ¶ 46) and W-L started selling its Neurontin® capsules in early 1994.

Thereafter, Teva, IVAX, and Eon submitted to the FDA Abbreviated New Drug Applications ("ANDAs") for gabapentin capsules and/or tablets. Teva Ans. at ¶¶ 21, 23 (capsules and tablets); IVAX Ans. at ¶¶ 22, 24 (capsules and tablets); Eon Ans. at ¶ 20 (capsules). All three Defendants' ANDAs included paragraph IV certifications pursuant to the Federal Food Drug and Cosmetic Act that W-L's '482 Patent was invalid or not infringed. *See* Teva Ans. at ¶¶ 21, 23; IVAX Ans. at ¶¶ 22, 24; Eon Ans. at ¶ 20. *See also* 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

W-L filed these lawsuits against Teva, IVAX, and Eon following Defendants' paragraph IV certifications, seeking to enforce the '482 Patent. W-L filed Amended and Supplemental Complaints in April 2008, and Defendants have filed Answers to these complaints. This is W-L's opening brief in support of its motion to strike certain affirmative defenses raised by Teva, IVAX and Eon in those Answers.

5.

## ARGUMENT

### I.   THE APPLICABLE LEGAL STANDARDS

Teva's and IVAX's Fourth and Fifth Affirmative Defenses (of unclean hands and patent misuse, respectively) and Eon's Fifth Affirmative Defense (of unclean hands) should be stricken from their Answers under Fed. R. Civ. P. 12(f).  "A motion to strike under Rule 12(f), is the 'primary procedure' for objecting to an insufficient affirmative defense."  *See United States v. Acorn Tech. Fund, L.P.*, C.A. No. 03-070, 2006 WL 237506, at *4 (E.D. Pa. Jan. 31, 2006) (citation omitted).   *See also* 2 James Wm. Moore, *Moore's Federal Practice* § 12.37[4] (3d ed. 2007) ("Because legal insufficiency is expressly included in Rule 12(f), a motion to strike is the proper means for attacking the legal insufficiency of a defense.").

This Court in *Eisai Co., Ltd. v. Teva Pharmaceuticals USA, Inc.*, 2008 WL 877966 (D.N.J. Feb. 13, 2008), provided a concise statement of the standard on a motion pursuant to Rule 12(f):

> Fed. R. Civ. P. 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The motion to strike an affirmative defense challenges the legal sufficiency of the pleading and is therefore governed by the same standard as a 12(b)(6) motion to dismiss.   An affirmative defense is insufficient as a matter of law if it cannot succeed under any circumstances.

6.

*Id.* at *2 (citations omitted).  *See also Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007) ("*Twombly*") (holding that to survive on a motion to dismiss under Rule 12(b)(6), "[f]actual allegations must be enough to raise a right to relief above the speculative level"); *Id.* at 1964-65 ("obligation to provide the 'grounds' of [pleading party's] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (same).

## II. DEFENDANTS' UNCLEAN HANDS AFFIRM-ATIVE DEFENSES SHOULD BE STRICKEN BECAUSE DEFENDANTS HAVE NOT ALLEGED ANY RELATIONSHIP BETWEEN THE ALLEGED MISCONDUCT BY W-L AND THE RELIEF SOUGHT IN THIS ACTION.

### A. Teva's and IVAX's Unclean Hands Affirmative Defenses Should Be Stricken.

Teva's and IVAX's identical allegations of unclean hands focus exclusively on W-L's alleged "illegal marketing program" and promotion of "off-label uses" for Neurontin®.  Teva Ans. at ¶¶ 45-60; IVAX Ans. at ¶¶ 44-59. Although Teva and IVAX allege a variety of Neurontin®-related marketing activities by W-L in fifteen paragraphs, they make no attempt to tie those alleged acts to any issue pending before this Court.  Specifically, Teva and IVAX allege that W-L refrained from seeking FDA approval for any non-epilepsy indications, purportedly because "[g]eneric equivalents may only be marketed for the same

7.

approved indications as NEURONTIN" and W-L allegedly "calculated that seeking non-epilepsy indications would allow generic equivalents to compete with a 'son of Neurontin' drug product" that W-L hoped would be approved for both epilepsy and non-epilepsy uses. Teva Ans. at ¶ 55; IVAX Ans. at ¶ 54. Teva and IVAX then allege in conclusory fashion:

> Warner-Lambert's admitted illegal and fraudulent promotion of NEURONTIN for unapproved uses— undertaken in part to limit competition from generic gabapentin products—constitutes unclean hands. Because of Warner-Lambert's unclean hands, Plaintiffs should be denied the injunctive and other equitable relief requested in the Amended Complaint.

Teva Ans. at ¶ 60; IVAX Ans. at ¶ 59. Nowhere in their unclean hands allegations do Teva or IVAX even mention the '482 Patent, let alone attempt to tie their allegations to the enforcement of that patent.

Teva and IVAX have not alleged, and cannot allege, that the purported misconduct is directly related, much less "closely connected," to the relief sought by W-L in this action (enforcement of the '482 Patent), as the law of unclean hands requires, or that the purported misconduct caused them any harm whatsoever. Thus, Teva and IVAX have failed to state an unclean hands defense.

The Third Circuit has stated that "the primary principle guiding application of the unclean hands doctrine is that the alleged inequitable conduct must be connected . . . to the matters before the court for resolution." *In Re New*

8.

*Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999).   Although "[t]he maxim of unclean hands mandates that 'he who comes into equity must come with clean hands,'" *Medpointe Healthcare Inc. v. Hi-Tech Pharmaceutical Co.*, 380 F. Supp. 2d 457, 463 (D.N.J. 2005), "courts of equity do not make the quality of the suitors the test."   *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933).   Rather, the operative principle is that "the connection between the misconduct and the claim must be close."   *New Valley*, 181 F.3d at 525.   "Only when 'some unconscionable act of one coming for relief has immediate and necessary relation to the equity that' the party seeks will the doctrine bar recovery."   *Id.* (quoting *Keystone*, 290 U.S. at 245).

Here, Teva and IVAX do not allege how W-L's purported off-label marketing directly relates or is closely connected to W-L's enforcement of the '482 Patent.  They cannot because there is *no* such connection.  Thus, Teva and IVAX wholly neglect to allege the "primary principle guiding application" of unclean hands – the "immediate and necessary relation" of the alleged bad acts to this litigation – and therefore fail to fulfill the pleading requirement of "'stating . . . a claim . . . with enough factual matter (taken as true) to suggest' the required element."  *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 127 S.Ct. at 1965 (2007)).

In fact, then Magistrate Judge Chesler, during litigation relating to earlier Neurontin patents, denied a motion to compel discovery filed by the

9.

Purepac defendants regarding W-L's alleged off-label marketing of Neurontin® as irrelevant to their unclean hands defense.  He explained that "[i]t is indeed clear that there are no cases which applied this doctrine to circumstances which are even close to that presented in this matter," and that an "assertion of an unclean hands defense under the circumstances contended" would make as much sense as an assertion "by which a careless motorist would be able to defend a subsequent personal injury suit by proving that the pedestrian had beaten his wife before leaving his home."   Transcript of Motion Hearing at 32-33, *Pfizer v. PurePac/Faulding*, C.A. No. 98-2749 (JCL) (Dec. 27, 2000) (attached as Ex. A to accompanying Declaration of John J. Francis, Jr. ["Francis Declaration"]).

Additionally, in factually similar circumstances in a trademark infringement case, the Third Circuit in *Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc.* held that defendants' allegation of plaintiff's alleged sale of adulterated drug batches and violations of FDA marking regulations could not support a defense of unclean hands because they "do not relate to the subject matter of [plaintiff's trademark infringement] claim."  747 F.2d 844, 855 (3d Cir. 1984).  *See also Medpointe*, 380 F. Supp. 2d at 465 ("Like the defendant's alleged misconduct in *CIBA-GEIGY* . . . the Court finds that, here, [plaintiff]'s alleged misconduct is also unrelated . . . because [it], at best, involves a failure to disclose a prior ruling on [a different] patent, and not on the [patent] actually involved in this case.").

10.

Furthermore, despite Teva's and IVAX's fifteen paragraphs of allegations relating to W-L's alleged improper marketing activities, they conclude by alleging only that W-L's actions were "undertaken in part to limit competition from generic gabapentin products." Teva Ans. at ¶ 60; IVAX Ans. at ¶ 59. This conclusory allegation does not state a defense because it is not supported by specific factual allegations. Teva and IVAX do not allege, for example, how W-L's alleged off-label marketing could or did *limit* competition in any way, much less how their allegations relate to these lawsuits alleging infringement of the '482 Patent.[2]   Under *Twombly*, Teva and IVAX must make "[f]actual allegations [sufficient] to raise a right to relief above the speculative level." *Twombly*, 127 S.Ct. at 1965.  They have not done that.

Finally, again assuming as true Teva's and IVAX's allegations of W-L's marketing misconduct, there is no allegation that they have anything to do with W-L's right to sue for infringement of the '482 Patent in this litigation. *See* Transcript of Motion Hearing at 33, *Pfizer v. PurePac/Faulding* (Ex. A to Francis

---

[2]    Defendants also do not allege that they have been precluded in any way from selling gabapentin for any use, nor could they make such an allegation because their products are freely substitutable for Neurontin®.   Thus, Defendants have only benefited from any expansion of the market based on any alleged off-label uses.

11.

Declaration) ("What is material is not that the Plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts or that the manner of dirtying renders inequitable the assertion of such rights against the Defendant.").  As noted above, the unclean hands allegations do not even mention the '482 Patent.

Because Teva and IVAX have not alleged any misconduct by W-L that gave rise to or affected the rights claimed by W-L in this litigation, their affirmative defenses of unclean hands should be stricken from their Answers.

**B.    Eon's Unclean Hands Affirmative Defense Should Be Stricken.**

Eon alleges even less than Teva and IVAX as a basis for unclean hands.  Eon summarizes W-L's alleged "illegal off-label marketing program" in only four paragraphs (Eon Ans. at ¶¶ 35-38).  Eon then concludes in an identical manner to Teva and IVAX, stating:

> Warner-Lambert's admitted illegal and fraudulent promotion of NEURONTIN for unapproved uses— undertaken in part to limit competition from generic gabapentin products—constitutes unclean hands. Because of Warner-Lambert's unclean hands, Plaintiffs should be denied the injunctive and other equitable relief requested in the Amended Complaint.

Eon Ans. at ¶ 39; Teva Ans. at ¶ 60; IVAX Ans. at ¶ 59.  As with Teva and IVAX, Eon's unclean hands allegations do not mention the '482 Patent.

12.

Eon's barebones defense includes little in the way of any details relating to the alleged "illegal off-label marketing program" or how this program was allegedly "undertaken in part to limit competition from generic gabapentin products . . . ."  Under *Twombly*, Eon's "obligation to provide the 'grounds' of [its] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  127 S.Ct. at 1964-65.  Beyond stating labels and conclusions, Eon makes no attempt to even plead the elements of a defense of unclean hands.  And, as with Teva and IVAX, Eon does not connect the alleged misconduct to the matter seeking resolution in this Court – infringement of the '482 Patent – which is a prerequisite to a defense of unclean hands.  *See New Valley*, 181 F.3d at 525.

The reasons that Teva and IVAX's unclean hands defense should be stricken apply *a fortiori* to Eon's pleading, and Eon's affirmative defense of unclean hands should be stricken from its Answer.

**III.    TEVA AND IVAX HAVE FAILED TO ALLEGE AN AFFIRMATIVE DEFENSE OF PATENT MISUSE BECAUSE THEY HAVE NOT ALLEGED THAT ANY ACT BY W-L BROADENED THE PHYSICAL OR TEMPORAL SCOPE OF THE '482 PATENT.**

Teva and IVAX identically allege that W-L committed patent misuse by improperly delaying the issuance of the '482 Patent, first, by "repeatedly making the same arguments to the patent examiner" and "repeatedly filing

continuation applications," (Teva Ans. at ¶ 64; IVAX Ans. at ¶ 63) and, second, by failing to cite the '326 Patent in the first-filed application (Teva Ans. at ¶ 65; IVAX Ans. at ¶ 64) and then withdrawing its application so it could cite the '326 Patent in a continuation application.  Teva Ans. at ¶¶ 68-69; IVAX Ans. at ¶¶ 67-68.  According to Teva and IVAX:

> By virtue of its intentional and unexcused delay, Warner-Lambert postponed both the issuance and expiration dates of the '482 patent.  Warner-Lambert did so in order to forestall and enjoin generic competition for NEURONTIN for as long as possible, and in any event longer than it otherwise would have been able to had the '482 patent issued in 1995.  This attempt to extend the temporal scope of patent protection for NEURONTIN constitutes patent misuse.

Teva Ans. at ¶ 72; IVAX Ans. at ¶ 71.  According to Teva and IVAX, "[b]ut for this delay, the '270 application would have issued as a patent on March 7, 1995 instead of April 2000, the issue date of the '482 patent."  Teva Ans. at ¶ 71; IVAX Ans. at ¶ 70.  Even accepting these allegations as true, however, Teva and IVAX have failed to state an affirmative defense of patent misuse.

To successfully assert patent misuse, an accused infringer must allege facts showing that the patentee "impermissibly broadened *the 'physical or temporal scope' of the patent grant* with anticompetitive effect."  *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1001 (Fed. Cir. 1986) (emphasis added).  "[I]n evaluating a patent misuse defense, '[t]he key inquiry is whether, by

14.

imposing conditions that derive their force *from the patent*, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect.'" *Monsanto Co. v. McFarling*, 363 F.3d 1336, 1341 (Fed. Cir. 2004) (emphasis added) (quoting *C.R. Bard, Inc. v. M3 Sys. Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998)); *B. Braun Medical v. Abbott Lab.,* 124 F.3d 1419, 1427 (Fed. Cir. 1997).

First, Teva and IVAX have not alleged, and cannot allege, that W-L improperly broadened the *physical* scope of the '482 Patent by imposing anticompetitive conditions on Teva, IVAX, or anyone else, such as by "us[ing] the patent as a . . . tool to restrain [trade practices] in areas not claimed under the patent." *Medpointe*, 380 F. Supp. 2d at 467.[3]

Second, although Teva and IVAX claim that W-L extended the *temporal* scope of the '482 Patent, their allegations do not support this claim. Under *Twombly*, Teva and IVAX must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 127

---

[3]     Such broadening typically occurs by "(1) requiring the purchase of unpatented goods for use with patented apparatus or processes, (2) prohibiting production or sale of competing goods, [or] (3) conditioning the granting of a license under one patent upon the acceptance of another and different license." 6 Donald S. Chisum, *Patents* § 14.03[3], at 19-451 (2007).

15.

S.Ct. at 1965.  Here, Teva and IVAX have not alleged and cannot allege that W-L

expanded the temporal scope of the '482 Patent beyond the expiration date of the

patent.[4]  To the contrary, Teva and IVAX explicitly admit in their Answer that the

'482 Patent "appears on its face to have issued on April 25, 2000, and to expire on

April 25, 2017" – a term of 17 years.  Teva Ans. at ¶ 14; IVAX Ans. at ¶ 15.

Hence, even accepting as true for purposes of this motion that W-L delayed the

issuance of the '482 Patent, the delay resulted in nothing more than a shift in the

beginning and end dates of the 17-year patent term, not an extension of the

temporal scope of the '482 Patent.  W-L is not aware of any case where a court has

found patent misuse in such circumstances.

Moreover, all of W-L's acts occurred before the '482 Patent issued;

therefore, Teva and IVAX do not and cannot allege that W-L obtained this shift in

the patent term improperly by "negotiat[ing] with the leverage of [the patent]

monopoly." *Aronson*, 440 U.S. at 265.  "The policy of the patent misuse doctrine

---

[4] Cases involving temporal expansions of a patent primarily concern situations where the patentee "negotiate[s] with the leverage of [the patent] monopoly" and "use[s] that leverage to project th[e] royalty payments beyond the life of the patent." *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 265 (1979) (quoting *Brulotte v. Thys Co.*, 379 U.S. 29, 32-34 (1964)). *See also Virginia Panel Corp. v. Mac Panel Co.*, 133 F.3d 860, 869 (Fed. Cir. 1997) (using "arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties" as an example of patent misuse).

is 'to prevent a patentee from using the patent to obtain market benefit beyond that which inures in the statutory patent right.'" *Monsanto*, 363 F.3d at 1341 (quoting *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 704 (Fed. Cir. 1992)).  Teva and IVAX do not allege that, once the '482 Patent issued, W-L used or enforced the patent improperly.

Finally, Teva and IVAX are critical of W-L's prosecution of the '482 Patent because W-L continued to seek allowance of its application over rejections by the Patent Office.  However, the fact that the patent prosecution took ten years does not undermine its validity:   "Multiple interviews are not illegal, and persistence in patent prosecution is not grist for patent invalidity." *Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 960 (Fed. Cir. 1997).

Because Teva and IVAX have not sufficiently alleged that W-L improperly broadened the physical or temporal scope of the '482 Patent, and have not alleged that W-L used the '482 Patent improperly in any way, Teva and IVAX have failed to state an affirmative defense of patent misuse.

17.

## **CONCLUSION**

For the foregoing reasons, W-L respectfully requests that the Court strike Teva's and IVAX's affirmative defenses of unclean hands and patent misuse and Eon's affirmative defense of unclean hands.

*/s/ John J. Francis, Jr.*
John J. Francis, Jr.
Michael C. Zogby
DRINKER BIDDLE & REATH LLP
500 Campus Drive
Florham Park, New Jersey  07932
(973) 360-1100
Attorneys for Plaintiffs Pfizer Inc.,
    Warner-Lambert Company LLC,
    Gödecke GmbH, and Pfizer
    Pharmaceuticals LLC

OF COUNSEL:

Jack B. Blumenfeld
Karen Jacobs Louden
MORRIS, NICHOLS, ARSHT &
    TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
(302) 658-9200

June 16, 2008

2370167.1

John J. Francis, Jr.
Michael C. Zogby
DRINKER BIDDLE & REATH LLP
*A Delaware Limited Liability Partnership*
500 Campus Drive
Florham Park, New Jersey 07932
(973) 360-1100
*Attorneys for Plaintiffs*
*Pfizer Inc., Warner-Lambert Company LLC,*
*Gödecke GmbH, and Pfizer Pharmaceuticals LLC*

Of Counsel:
Jack B. Blumenfeld
Karen Jacobs Louden
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re Gabapentin Patent Litigation | MDL No. 1384 |
|  | Master Docket No. |
|  | 00-CV-2931 (FSH) |
|  |  |
|  | **This Filing Applies To:** |
|  | Teva Defendants |
|  | C.A. No. 00-CV-4168 (FSH) |
|  | C.A. No. 00-CV-4589 (FSH) |
|  |  |
|  | IVAX Defendants |
|  | C.A. No. 00-CV-6073 (FSH) |
|  | C.A. No. 01-CV-0193 (FSH) |
|  | C.A. No. 01-CV-1537 (FSH) |
|  |  |
|  | Eon Defendants |
|  | C.A. No. 01-CV-2194 (FSH) |

## DECLARATION OF JOHN J. FRANCIS, JR.
## IN SUPPORT OF MOTION TO STRIKE CERTAIN
## AFFIRMATIVE DEFENSES OF TEVA, IVAX, AND EON DEFENDANTS

I, JOHN J. FRANCIS, JR., declare as follows:

1.     I am Of Counsel at the law firm of Drinker Biddle & Reath LLP, counsel for Plaintiffs. I submit this Declaration in support of Plaintiffs' Motion to Strike Certain Affirmative Defenses of Teva, IVAX, and Eon Defendants. I am a member in good standing of the State Bar of New Jersey and this Court. I have personal knowledge of the information set forth in this Declaration.

2.     Attached hereto as **Exhibit A** is a true and correct copy of relevant pages of the Transcript of Motion Hearing, *Pfizer v. PurePac/Faulding*, C.A. No. 98-2749 (JCL) (Dec. 27, 2000).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 16, 2008

John J. Francis, Jr.

# EXHIBIT A

```
 1
 2                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEW JERSEY
 3

 4    Pfizer,                    .        Docket #CV-98-2749 (JCL)
      Warner-Lambert,            .
 5                               .
             Plaintiff(s).       .
 6                               .        United States Courthouse
                  v.             .        Newark, New Jersey
 7                               .        December 27, 2000
      PurePac/Faulding,          .
 8                               .
             Defendant(s).       .
 9    . . . . . . . . . . . . . . . . . . . . .

10
                       TRANSCRIPT OF MOTIONS HEARING
11              BEFORE THE HONORABLE STANLEY R. CHESLER
                    UNITED STATES MAGISTRATE JUDGE
12
      APPEARANCES:
13
      For The Plaintiff:            John J. Francis, Jr., Esq.
14                                  Drinker, Biddle & Shanley, LLP
                                    500 Campus Drive
15                                  Florham Park, NJ 07932

16                                  Hugh C. Barrett, Esq.
                                    Fitzpatrick, Cella, Harper
17                                  & Scinto
                                    30 Rockefeller Plaza
18                                  New York, NY 10112

19                                  Dave J. Lorenz, Esq.
                                    Fitzpatrick, Cella, Harper
20                                  & Scinto
                                    30 Rockefeller Plaza
21                                  New York, NY 10112

22                                  Nancy A. Juett, Esq.
                                    Fitzpatrick, Cella, Harper
23                                  & Scinto
                                    30 Rockefeller Plaza
24                                  New York, NY 10112

25
```

2

|    |                      |                                                                                          |
|----|----------------------|------------------------------------------------------------------------------------------|
| 1  | For Defendants:      | Arnold B. Calmann, Esq.<br>Saiber, Schleshinger, Satz                                     |
| 2  |                      | & Goldstein, LLC<br>One Gateway Center, 13th Fl.                                          |
| 3  |                      | Newark, NJ 07102                                                                          |
| 4  |                      | Edgar H. Haug, Esq.<br>Frommer, Lawrence & Haug, LLP                                      |
| 5  |                      | 745 Fifth Ave.<br>New York, NY 10151                                                      |
| 6  |                      | Steven M. Amundson, Esq.                                                                  |
| 7  |                      | Frommer, Lawrence & Haug, LLP<br>745 Fifth Ave.                                           |
| 8  |                      | New York, NY 10151                                                                        |
| 9  |                      | Terri Lee-Young, Esq.<br>Frommer, Lawrence & Haug, LLP                                    |
| 10 |                      | 745 Fifth Ave.<br>New York, NY 10151                                                      |
| 11 | Audio Operator:      | Michelle Ellis                                                                            |
| 12 | Transcribing Firm:   | Writer's Cramp, Inc.                                                                      |
| 13 |                      | 6 Norton Rd.<br>Monmouth Jct., NJ 08852                                                   |
| 14 |                      | 732-329-0191                                                                              |
| 15 | Proceedings recorded by electronic sound recording, transcript produced by transcription service. | |
| 16 |                      |                                                                                          |
| 17 |                      |                                                                                          |
| 18 |                      |                                                                                          |
| 19 |                      |                                                                                          |
| 20 |                      |                                                                                          |
| 21 |                      |                                                                                          |
| 22 |                      |                                                                                          |
| 23 |                      |                                                                                          |
| 24 |                      |                                                                                          |
| 25 |                      |                                                                                          |

3

1    THE COURT:  Good morning everybody.

2    ALL:  Good morning, Your Honor.

3    THE COURT:  I guess we should put our appearances on

4    the record and then settle in for a nice long session, folks.

5    MR. FRANCIS:  For Warner Lambert and Pfizer, John

6    Francis, Drinker, Biddle & Shanley.  And with me is Mr.

7    Barrett, Terry Barrett of Fitzpatrick, Cella, Harper & Scinto.

8    THE COURT:  Good morning.

9    MR. FRANCIS:  Also behind us are Dave Lorenz and Nancy

10   Juett of Fitzpatrick, Cello.  And behind them if I may, Judge,

11   are two of my children, my daughter Carrie who's in her first

12   year of law school, and my son, John.

13   THE COURT:  Good morning.  Hi.

14   MR. FRANCIS:  Good morning, Your Honor.

15   THE COURT:  Mr. Calmann?

16   MR. CALMANN:  Good morning, Your Honor, Arnold

17   Calmann, Saiber, Schleshinger, Satz & Goldstein for Faulding

18   and PurePac.  And I'll let counsel introduce themselves.

19   You're familiar with them, Judge.

20   THE COURT:  I could never forget them.

21   MR. HAUG:  Good morning, Your Honor, Ed Haug.  And on

22   my left, Steve Amundson, Frommer, Lawrence & Haug for PurePac.

23   And to Arnie's left, Brenda McGraf from Faulding.  And behind

24   us Terri Young an associate also with the firm.

25   THE COURT:  Good morning to all of you.  Mr. Haug,

4

1   before we proceed, did you send me a letter indicating what you

2   believe should be an appropriate agenda today?

3          MR. HAUG:  No, Your Honor.

4          THE COURT:  Okay.  So all I've got is Warner Lambert's

5   proposed agenda?

6          MR. HAUG:  Yes, and I think it's a good one.

7          THE COURT:  Fine.

8          MR. HAUG:  And there are some details that will be

9   added to it as we go along.

10         THE COURT:  Okay.  And I understand that all of you

11  have gotten a copy of Judge Lifland's opinion on the various

12  12(B)(6) and --

13         MR. FRANCIS:  I received mine --

14         THE COURT:  -- motions.

15         MR. FRANCIS:  -- yesterday.  Mr. Barrett has not.  I

16  gave him a copy this morning, but he hasn't had a chance to

17  look at it.

18         MR. BARRETT:  John filled me in on some highlights,

19  Your Honor, so that I'm --

20         THE COURT:  Let me put it this way.  The main

21  highlight seems to be bifurcation of the non-patent claims, and

22  dismissal of the PurePac DJ action, if I recall correctly.

23         MR. FRANCIS:  I think that's right, Your Honor.  And

24  that last aspect of it, the dismissal of the declaratory

25  judgment action, it seems to me removes a great part if not all

5

1    of the controversy that we've had over the Order of

2    Consolidation.

3            THE COURT:  That's what hit me.  Would that

4    essentially be correct?

5            MR. CALMANN:  I don't think so, Your Honor.

6            THE COURT:  And why so?  I'm just curious.

7            MR. CALMANN:  There are two cases that remain, Your

8    Honor, one of which was filed on June 15 after receiving notice

9    on June 14.  Warner Lambert takes the position that that case

10   is not a Hatch Waxman case, but the later case is.  Why would

11   they take that position?  Because by taking the later position

12   they have 30 months stay at a much later point, and that

13   further extends the monopoly that we have asserted that Judge

14   Lifland has found summary judgment should be denied on.

15           MR. FRANCIS:  With the dismissal of the declaratory

16   judgment action, the only cases that exist on the Lactam free

17   patents are both suits filed by Warner Lambert.  The first one

18   that we filed is to avoid a problem on the 45 day period,

19   because it's in response to their suit.  And the third one, the

20   3522 case, is the one that really counts.  That's the one that

21   we filed within the 45 days of their notice to us.  And that's

22   the one that this Court has already selected as the lead case.

23   So you don't have to bother with the declaratory judgment

24   action, and you don't even have to bother, you can consolidate

25   the other -- the two Warner Lambert cases, and as you said

6

1   before, use the date as the date when we filed the 3522

2   complaint.

3        MR. CALMANN:  Your Honor, first of all factually what

4   Mr. Francis just mentioned is not accurate.  Your Honor did not

5   select the later date.  Mr. Barrett specifically requested that

6   date, and Your Honor said, "Well, all right, that's fine."

7   When we got through the process, it was very clear that the

8   2931 case, which was filed on the 15th after notices were

9   received on the 14th, is absolutely a Hatch Waxman case.  They

10  filed it after receiving notice.  That's what the statute says.

11  That's what they did.  They would like to ignore that case, go

12  to the later case, and have that case be used for the 30 month

13  stay.  That further extends their monopoly position.

14       There's only one case that comes first, and that's the

15  first in time.  And in our Circuit, as Your Honor is aware, in

16  the Federal Circuit the first filed suit rule applies

17  generally.  And I'm prepared to argue other aspects of the

18  consolidation order as well, Your Honor.  I didn't know you

19  wanted to get into it now.  But at least on that one issue,

20  which is a very critical issue, we still have a problem.

21       MR. FRANCIS:  Judge Lifland in his opinion dealt with

22  the first filed and said that it doesn't matter here.

23       THE COURT:  Okay.  I will tell you, Mr. Calmann, Mr.

24  Francis, as far as I'm concerned which one has priority, which

25  one is going to function as the starting of the clock on Hatch

Waxman is not something which has to be dealt with in this Consolidation Order.  I'm gonna issue a Consolidation Order.  I'm gonna draw my own Order.  It is going to be consolidated sua sponte.  And the Order is simply going to say they are consolidated for all purposes.  I'm gonna put it under the lowest docket number that still survives.  It will also provide that this consolidation has no effect on the priority or the timing under the Hatch Waxman Act in any way, shape or form.  And you will be both left to bang your heads against the appropriate wall, but I'm not going to deal with this one any further.  All right?

        MR. CALMANN:  Thank you, Your Honor.

        THE COURT:  Good.  Next we have Mr. Haug, your Motion to Compel.

        MR. HAUG:  Thank you, Your Honor.  If I may, I would like to break that up into two parts.  I'm going to deal with the off label use so-called issue, and then Steve Amundson will deal with many of the other issues, if that's all right.  Again, on the off label use issue, as I'm now referring to it, we are talking about the tablet case.  We have our motion.  We got the response from Warner Lambert on it last week.  And I'd like to reply to that response very briefly.  I think that most of the issues are well documented in the briefs.

        However, a couple things.  First of all, the tablet case is not the capsule case.  They're different cases.  There is no

1    law of the case that applies to the tablet case.   There is no

2    collateral estoppel, res judicata or any such thing, in our

3    view, that applies.   They are different cases.   They are two

4    separate complaints filed by Warner Lambert.   And as a result

5    of that, Warner Lambert and PurePac have very different rights

6    and duties and obligations that flow from both cases.   They're

7    different products.   A capsule and a tablet, while they may

8    seem to be the same but for shape, they're not.   The FDA

9    considers those two different products.   They have two

10   different approvals.   They have two different 30 month periods

11   that apply to them, and so on and so forth.   They're different

12   products.

13       Having said that, why is PurePac entitled to this

14   information?   What we did was, we subpoenaed Davis, Polk, which

15   is another law firm representing Warner Lambert.   We're not

16   totally sure what they do other than they are representing

17   Warner Lambert in connection with a suit, I think, by the

18   Government and also a whistle blower case that's going on in

19   Boston.   We learned about them in part from documents that we

20   were able to get from the Court in Boston.   And, in fact, some

21   of those documents are attached to our motion.   I think as

22   Exhibit A there is a disclosure there by Party Franklin.   And

23   that goes into a lot of the allegations that are extent in that

24   investigation and in that case.

25       Now, we know that there are a number of boxes that have

1   been collated, copied, marked for production, call it what you

2   will, and in fact we believe produced already in that case.

3   All we're asking for from Davis, Polk is the opportunity to

4   look at those documents.  Now, they're relevant in this case,

5   in the tablet case, for a number of reasons.  But the one

6   reason that I would like to talk about with the Court here is

7   they go directly to our unclean hands defense.  They go

8   directly to the arguments as to why Warner Lambert should be

9   estopped from being able to prove its inducement infringement

10  claim in this case based on their own activities in the

11  marketplace.  They're highly relevant to the equitable or the

12  injunctive relief, if you will, that Warner Lambert is asking

13  the Court for.  Ultimately there will be a decision by the

14  Court, with or without a jury, that using its own inherent

15  powers and at its discretion will either grant an injunction,

16  deny the injunction, or modify and do what it thinks is

17  appropriate at that point in time.

18       We believe very strongly that we need to be able to show

19  the Court all of the relevant evidence on the activities of

20  Warner Lambert in creating the off label market.  That is their

21  claim against PurePac.  They created the market through their

22  own activities and now are saying that even though PurePac has

23  no intent of trying to sell into that market, there is no

24  document that says they're going to do that at all.  And, in

25  fact, there is evidence directly to the contrary.  But they're

10

1   going to ask the Court to infer, for whatever reasons, that

2   PurePac is actively and knowingly engaging in infringement by

3   inducing others to infringe, aiding and abetting the

4   infringement of others.  That's their case.  I'm talking, of

5   course, only about the 479 patent right now.  That's their

6   case.

7        So we're not confronted with, at trial, Warner Lambert

8   will call either a Warner Lambert person or an expert who is

9   presumably going to explain this market.  He or she is going to

10  talk about what Gabapentin is and what the market for

11  Gabapentin is.  And they're going to talk about the approved

12  indication for treatment of epilepsy, which is a certain

13  percentage.  And then they're gonna talk about all this off

14  label use.

15        THE COURT:  Well, does all of this off label use -- as

16  I understand it, the patent doesn't cover all of this off label

17  use.

18        MR. HAUG:  Correct.

19        THE COURT:  It covers certain limited off label use.

20        MR. HAUG:  Yes, the 479 patent is what we call

21  treatment of neuro-degenerative disease, which depending upon

22  which data you might look at, it might be as little as 2%, 4%.

23  But that's a factual question as to how much of the off label

24  use is directed to the treatment of neuro-degenerative diseases

25  versus other things which are outside the scope of the 479

11

1   patent.  So that all is a factual question.  And the important

2   point I'm trying to make, though, is that whoever this witness

3   is, or however Warner Lambert puts this evidence into the case,

4   we have a right to discovery in order to prepare ourselves to

5   cross examine that witness or that evidence.  And right now we

6   can't do that.  And that's a serious problem.

7       And, again, what kind of evidence are we looking for?  You

8   know, we did talk about this clearly.  Obviously Your Honor

9   ruled in the capsule case.  That's no secret and it's all in

10  the papers.  And the question at one point was asked, you know,

11  why do we care about the FDA finding Warner Lambert has done

12  something improper or not?  Well what we really care about is

13  the representations that Warner Lambert has made to the FDA or

14  others, whether it's in another law suit to another Court or in

15  a deposition or wherever it may be.  What we care about are the

16  representations that their people have made about whether they

17  have or haven't promoted off label use and what the facts are,

18  what off label use there is out there and how doctors are

19  prescribing this drug, if they are, and what leads them to do

20  that, and so on and so forth.  That's what we're trying to get.

21  We have a right to get that to prepare our defense on the

22  inducement to infringe.

23      And, again, if Warner Lambert created the situation that

24  they say is a necessary predicate to prove their infringement

25  case, we believe we have a right to find out how they created

1  that situation.  And all we're asking for are the documents

2  that they already have collected, documents which they've

3  already produced.  They're already -- they're together.

4  There's no burden here.

5       THE COURT:  Mr. Haug, I've been listening to you very

6  carefully.  And your papers talk about utilizing this material

7  for an unclean hands defense.  The argument you've just made

8  doesn't focus on an unclean hands defense.  It focuses on a

9  contention that you've got a right simply in terms of cross

10  examining witnesses who they may produce to explore how the off

11  label market that they contend you'll infringe came into

12  existence in the first place, as simply one element of

13  exploring their case.  Now, conceptually I've got to know

14  whether your argument is one or the other or both.

15       MR. HAUG:  The argument is to both, clearly.  I do

16  think -- I think one of the difficulties maybe I have here is

17  unclean hands is a very -- you know, it's a very broad concept.

18  And so, you know, I can't point to -- you know, I need to know

19  what Mr. X said here and there in this document to go to the

20  unclean hands defense.  I don't know.  That's --

21       THE COURT:  Well let me ask you this.

22       MR. HAUG:  -- what discovery is about.

23       THE COURT:  Is, in the context of patent litigation,

24  the concept of unclean hands indeed such a broad concept?

25       MR. HAUG:  It's an equitable concept.  I think fairly

13

1   stated, most of the cases, substantially all of the cases to my

2   knowledge, usually relate to how the patent was procured and

3   equitable conduct.  You know, whether or not certain product

4   was or wasn't disclosed, and so on and so forth.  Or, for

5   example, certain information was or wasn't disclosed to the

6   Patent Office, like a declaration is put in and they only put

7   the good data in and not the bad data.  Now, that's a good

8   analogy though.

9           THE COURT:  All right, but isn't that -- that's one

10  category of unclean hands.  And as I understand it, the other

11  category of unclean hands ends up being largely analogous to

12  certain types of anti-trust type activity.  In short, improper

13  efforts to broaden the monopoly conferred by the patent, and

14  doing it in such a manner as to in fact broaden it beyond that

15  authorized by the patent statutes.  Correct?

16          MR. HAUG:  Correct.

17          THE COURT:  All right.  Those are the two main

18  categories that the unclean hands doctrine has fallen into with

19  regard to patent litigation, at least.  And now how do you

20  analogize this particular claim with regard to those types of

21  claims?

22          MR. HAUG:  Well, I think on the patent side -- why

23  don't we start with the easier one perhaps?  I think on the

24  unfair competition or anti-trust issue, clearly any activities

25  done by Warner Lambert to either create or perpetuate or expand

1    the monopoly that they have in a relevant market is highly

2    relevant to the question of whether or not there is anti-trust.

3    And there has been an anti-trust violation.

4          THE COURT:  But that's not the contention here.

5          MR. HAUG:  No, because we're not talking about the

6    anti-trust claim in this --

7          THE COURT:  Right.

8          MR. HAUG:  -- motion.  All right.  Even though we have

9    the decision from Judge Lifland yesterday, but that's for

10    another day, that we bifurcate.  So that's why our papers don't

11    focus on it.  On the patent side, again it's an equitable

12    concept.  You know, Warner Lambert is -- the only thing they're

13    asking for on the 479 at this point, from my understanding, is

14    an injunction both against PurePac from proceeding with the FDA

15    in getting the final approval, and also if necessary to get the

16    FDA from approving their ANDA.  That's what they're asking for.

17    And they're doing that --

18          THE COURT:  Well, Ed --

19          MR. HAUG:  -- on the basis --

20          THE COURT:  -- Mr. Haug, that's because --

21          MR. HAUG:  -- of infringement.

22          THE COURT:  -- it's the only thing they can ask for,

23    as a practical matter at this point.  Correct?

24          MR. HAUG:  Well, I guess so.  I mean, you know, I

25    don't know.  The -- well, you know, I have to say by the time

1   trial comes around I don't know.  But it could change.  But --

2            THE COURT:  All right.

3            MR. HAUG:  -- having said that, that's what they're

4   asking for.  And the trial here is going to involve a lot of

5   legal issues.  We had an argument here not too long ago about a

6   lot of those issues, the validity and so on and so forth.  But

7   it's also going to involve equitable issues.  And the Court,

8   based on the evidence that it hears, is going to fashion a

9   remedy, if it thinks any remedy is required or appropriate.

10  And at that point in time we want to be able to have the Court

11  consider all of the relevant evidence, which would certainly

12  include what Warner Lambert has done to create the market that

13  is a necessary predicate to prove their case of infringement.

14           THE COURT:  Let me ask you a hypothetical.  Let's

15  forget about off label use of a method patent.  All right?  And

16  let's take a hypothetical.  Let's take hypothetically we have a

17  saline solution which is just ordinary salt and water in a

18  dispenser.  And it just so happens that one potential use for

19  this saline solution is to use it as a conductor in terms of

20  applying stick-on electrodes for EKGs.  All right?  And, by the

21  way, it's not totally hypothetical.  Mr. Barrett's firm

22  defended this case for years with two brothers suing each

23  other, with Mr. Lerner, if I recall correctly, representing the

24  Plaintiff brother in this particular case.  So this may be a

25  vague -- my recollection may be vague, but who knows?  Mr.

16

1  Francis is smiling.  He may even remember this one.

2         MR. FRANCIS:  I'm trying to forget it, Judge.

3         THE COURT:  But at any rate, it was a method patent

4  which covered the use of a saline solution to be applied in --

5  constituting a conductor for the use of electrodes in EKGs.

6  And the directions for using this method were printed on the

7  package of Plaintiff's product.  And in effect it was a package

8  license for the method.  All right?  Which is if you purchased

9  the bottle of saline, you got a license to use the method.  The

10  Plaintiff's brother decided to package the same saline

11  solution.  Did not list the instructions on it.  But the

12  contention was that the Plaintiff's brother knew perfectly well

13  that when it was sold in those packages to the various

14  institutions and providers that were involved, that they would

15  know perfectly well what to do, which would be to practice

16  Plaintiff's patent.  There are some vague similarity so far.

17         Now, let me ask you this.  If it turns out that the

18  Plaintiff in this case had been paying bribes to a hospital's

19  supply officers in order to induce sales of his saline and

20  thereby, of course, increase the use of his patent, and thereby

21  built his market, would that constitute an unclean hands

22  defense by the Defendant alleged infringer?

23         MR. HAUG:  Yes, in my judgment, absolutely.  If you

24  can prove --

25         THE COURT:  And why is that?

17

1    MR. HAUG:  Because the Plaintiff is going to Court

2  seeking equity.  And he's seeking equity presumably because he

3  has the right to do that.  And any who seek equity must do

4  equity.  And all of those principles apply here.  And if the

5  Plaintiff was engaging in activity that is directly related to

6  what he is now trying to get relief for, it is relevant.  And

7  the Court, I think, would have to consider that and weigh it as

8  one of the factors that Courts weigh when they decide to give

9  equity or not give equity.  So I think to that extent it's a

10  good example, quite frankly.  And I certainly think as a stage

11  of discovery, the Defendant should be able to probe that and

12  find out exactly what did happen or didn't happen so that the

13  parties can then decide at trial, or prior to trial, what is or

14  isn't admissible at trial.

15    THE COURT:  Why and how does the Plaintiff's marketing

16  tactics bear a direct relationship to the right which he is

17  seeking to assert?

18    MR. HAUG:  Why?

19    THE COURT:  Yes.

20    MR. HAUG:  I think if it falls under -- looking at the

21  Keystone Driller case, which is the Supreme Court case which

22  both sides have actually cited in their briefs, I think that

23  the key passage or key holding in that case is that the maxim

24  of unclean hands does not apply where Plaintiff's misconduct is

25  not directly related to the merits of the controversy.  And so

1  you have to look as to whether or not the challenged acts are

2  directly related to the controversy.  And I think that is a key

3  question.  Now in your hypothetical, you know, I --

4          THE COURT:  How is it directly related to the

5  controversy?  The controversy is -- first of all, the right

6  which is being asserted is a right to a monopoly created by the

7  patent loss.  Okay?

8          MR. HAUG:  Yes.

9          THE COURT:  There is no assertion that the Plaintiff

10  engaged in inequitable conduct or unclean hands in connection

11  with securing those rights.  So, number one, we are

12  automatically somewhat further afield than in the Keystone case

13  in which, of course, there were misrepresentations in

14  connection with essentially the securing of one of the three

15  patents in the --

16          MR. HAUG:  Right.

17          THE COURT:  -- suit, if I recall correctly.  So it

18  doesn't relate to that.  It doesn't relate to the use of the

19  patent, per se.  Why is it any different from someone who has a

20  patent and who also is, say, a murderer?

21          MR. HAUG:  Because the murder really is too distant

22  from the question of infringement, even if the alleged

23  infringer is the person who was murdered, I suppose.  I mean

24  it's just too distant.  Here, Warner Lambert is saying there's

25  an off label market.  And everyone knows, including the

1   Defendant, that if they're allowed to sell the product for any

2   use, it's going to get sold for that off label use.  And,

3   therefore, we ask you, this Court, to enjoin them from selling

4   it for anything including what they got an approval for.

5   That's what this case is all about.

6          THE COURT:  Let me throw this hypothetical at you.

7   Let's take it out of the realm of a method patent.  Let's have

8   a product patent, a product patent for Gabapentamin.  Is that

9   the correct pronunciation?

10         MR. FRANCIS:  Very close.

11         MR. HAUG:  Yes.  There are --

12         MR. FRANCIS:  Gabapentin.

13         MR. HAUG:  -- a number of those.

14         THE COURT:  I'll try Neurontin.  It's easier.  Let's

15  say that there was still a product patent for Neurontin, which

16  was in effect.  And let's say that the Plaintiff's salesman in

17  marketing that product started bribing doctors and hospital

18  employees to sell the product.  And then you come along and

19  you're infringing.  They seek an injunction.  Is their bribery

20  to sell the product where it's a product patent vulnerable to

21  an unclean hands defense?

22         MR. HAUG:  That's -- I think that's without a doubt

23  further distant than the last hypothetical you gave me.  I'm

24  not sure that it would be, because I think that the patentee --

25  excuse me, the Defendant can prove its affirmative defense of

1  non-infringement on the basis of the product.  All they have to

2  do is look at the patent, get a legal interpretation of what

3  the patent does or doesn't cover, and then compare that to the

4  accused product.  And presumably that is all you need to do to

5  determine whether or not there is infringement.  And so I don't

6  know that whether the patentee at that point is bribing people

7  to buy the product really adds much, if anything, to the

8  infringement inquiry.

9       However, it might still be relevant from the standpoint

10  that they're seeking an injunction.  I mean they're asking the

11  Court for an injunction.  And the Court, in my understanding,

12  certainly would have the power to say, "Yes, they are

13  infringing.  But, you know what?  I'm not going to enjoin their

14  use because you guys don't deserve an injunction because of all

15  these acts that you did."  I think the Court has the power, the

16  legal and equitable power, to do that.  And Courts have done

17  that.

18       THE COURT:  Are you aware of any Court which has

19  recognized an unclean hands defense under the hypothetical

20  which you have just described?

21       MR. HAUG:  Where the people buy a product and they're

22  not being held to unclean hands?  Am I aware of a case that

23  held that?  No, no.

24       THE COURT:  And let's face it, Mr. Haug, it's not in

25  today's day and age, while I'm describing in rather blunt

21

1   terms, all right -- we're all familiar with the various and

2   sundry investigations which the Government engages in, in terms

3   of methodologies of purveying drugs.  And it's not a far

4   fetched hypothetical, is it?

5           MR. HAUG:  No, it's not -- that a drug company would

6   bribe people?  No, not at all.  But --

7           THE COURT:  We wouldn't call it a pure bribe.  We

8   would --

9           MR. HAUG:  Honorarium.

10          THE COURT:  -- label it perhaps an --

11          MR. HAUG:  Call it an honorarium.

12          THE COURT:  -- inducement which Medicaid and Medicare

13  would frown upon, but --

14          MR. HAUG:  Your Honor, if I may -- I don't mean to

15  interrupt, but if I may, you know, if we're into -- to the

16  extent we're talking about hypotheticals, you know, if the

17  patentee in that scenario were to actually bribe a particular

18  hospital, let's say, to the -- or bribe them and said, "We want

19  you to call up this Defendant and buy a bunch of products from

20  them."  And they do, and they sell that product to that

21  hospital, and then the patentee sues them for infringement, I

22  think the fact that the patentee bribed the hospital to create

23  the act of infringement is certainly actionable and would go to

24  unclean hands and would act as an estoppel.  I do.  They

25  created -- I mean it's like entrapment.

22

1              THE COURT:   Okay, but we're not talking about that.

2   We're talking about where -- my hypothetical is where the

3   patentee offered an unlawful inducement to secure the purchase

4   of its product and whether that constitutes an unclean hands

5   defense.

6              MR. HAUG:   I don't know of a case that holds that.   I

7   really don't.   Whether it's been tried or there's a case saying

8   that that can't be the case, I don't know either.   I'd like to

9   add one more thing.   You know, from the standpoint of the

10   patent itself, the invalidity in procurement of the patent, one

11   of the key defenses that we have in this case on the 479 patent

12   is invalidity.   It is PurePac's position that the 479 patent is

13   invalid because what it claims is false.   It doesn't work.   To

14   put it another way, the patent says Gabapentin can be used to

15   treat ALS.   We have evidence in the case that without question,

16   I believe, shows that it doesn't work for ALS.

17           Now, if Warner Lambert has been promoting Gabapentin for

18   the treatment of ALS in the face of a patent that says --

19   covers that use, but at the same time they are aware of

20   evidence that it does not work, we think that, too, goes to

21   unclean hands and would render the patent unenforceable, not to

22   mention invalid.

23           THE COURT:   Well --

24           MR. HAUG:   And that is a key defense --

25           THE COURT:   -- Mr. Haug --

1      MR. HAUG:  -- in the case.

2      THE COURT:  -- you're losing me there.  If in fact the

3   patent has no utility, then it's invalid, right?

4      MR. HAUG:  Correct.

5      THE COURT:  And if you've got evidence establishing

6   that which a trier of fact will accept, you're gonna win.

7      MR. HAUG:  Yes.

8      THE COURT:  Okay?  Now, if you have evidence that they

9   had information that the patent did not have utility at the

10  time the patent was being processed, then we would indeed have

11  inequitable conduct before the Patent Office.  Correct?

12     MR. HAUG:  I would -- yes.

13     THE COURT:  All right.  Are you suggesting to me that

14  if, subsequent to the issuance of a patent, information comes

15  forward which casts some doubts on whether or not the patent is

16  -- has utility, that that is going to constitute unclean hands?

17     MR. HAUG:  Yes, in the enforcement of that patent,

18  absolutely.  And it may even rise to the level of an anti-trust

19  violation.  Definitely.  If you know your patent to be invalid

20  and you continue to enforce it and try to enforce it after you

21  have that knowledge, that is very definitely unclean hands.

22  And it could, as I said, patent misuse.  And it could rise to a

23  level of an anti-trust violation.

24     THE COURT:  Okay.  Anything further you'd like to

25  argue on this issue?

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

1             MR. HAUG:  No, I don't think so.

2             THE COURT:  Mr. Francis, who is up --

3             MR. FRANCIS:  Mr. Barrett is.

4             THE COURT:  -- you or Mr. Barrett?  Mr. Barrett?

5             MR. BARRETT:  It shall be me, Your Honor, although in

6 light of your excellent questions you posed to Mr. Haug, I'm

7 not sure that I should proceed with an argument rather than

8 just field your questions to me.  But let me just start with

9 one thing.  Let me just paint the facts as Mr. Haug would like

10 them here so we're all -- everybody's clear that we're on the

11 same table.  And that is what he is suggesting -- and these are

12 putting these facts in the best light for Mr. Haug's argument -

13 - is that somehow Warner Lambert went out and created a market

14 for a drug and a particular use.  Actually created a market for

15 this particular use.  And did so illegally.  Then taking a

16 patent that it had covering that particular use, it has sued

17 PurePac for patent infringement.  And that act of illegally

18 creating the market for the very act that Mr. Haug's client is

19 accused of infringing, is indeed an act of unclean hands which

20 taints the patent and its enforcement.

21       Now I think that's painting them in the best light for Mr.

22 Haug.  Now it's not to mean that those facts are true.

23 Certainly things such as Warner Lambert -- no drug company can

24 create a market for a drug.  Doctors do that.  Doctors and

25 patients do that.  Certainly drug companies can promote and

1   make a market larger, but they can't generate from scratch a

2   market for a drug, I don't believe.  And I don't know of any

3   instance where they've done that.

4       Second, we're not talking here about any suggestion that

5   there's any potential or even allegation of illegal promotion

6   with respect to this particular treatment.  So that fact is not

7   a given.  But putting the facts in the best light for Mr. Haug,

8   that's what he's suggesting.  And I believe Your Honor is going

9   to agree with me when I say that that has absolutely no

10  precedent in the case law.  It is a totally unprecedented

11  suggestion that those kinds of acts by a drug company or a

12  marketer could somehow lead to an unclean hands defense, making

13  the patent unenforceable.

14      I like your -- the way you broke apart the possibility

15  that this defense could have something to do with some broader

16  anti-trust allegations, monopolization.  Somehow this could

17  play some kind of a theory.  I think that's where you were

18  going there.  But this motion has nothing to do with anti-trust

19  discovery.  The anti-trust issues in this case have been

20  stayed, including discovery.  And Mr. Haug knows that.  But he

21  is, as Your Honor understands, he is seeking this discovery for

22  his patent case.  So he's got to tie it into the aspect of

23  unclean hands as it totally relates to the patent.  Your Honor

24  understands the Keystone case, the case that he keeps citing

25  has nothing to do with this kind of activity.  It relates to

1  the standard unclean hands that relates to the obtaining of a

2  patent, doing bad things before the Patent Office.

3        Indeed if there is any precedent, I think that's that 3rd

4  Circuit case in <u>Ciba-Geigy vs. Bolar</u>, although a trademark

5  case, has some pertinence here because it was an attempt to tie

6  in potentially illegal acts by the enforcer of the property

7  right as an unclean hands defense.  And the Courts rejected it

8  and said the two things are totally separate.  Whether Achieva

9  markets its drug illegally or promotes it for this second step

10 instead of the third step, and in fact the suggestion is there

11 that they may have created some kind of infringing market

12 there, that they then sued Bolar on -- there was no tie-in that

13 made it a viable unclean hands defense.  So I think the

14 precedent clearly goes in the other direction.

15        THE COURT:  Let me ask you this.  You just stated

16 earlier that your view of the record indicates that there is no

17 evidence or no suggestion that there was -- or no issue that

18 there was any improper promoting of Neurontin for off label use

19 with regard to the off label uses that are covered by the

20 patent?

21        MR. BARRETT:  Yes, Sir.

22        THE COURT:  Okay.

23        MR. BARRETT:  Based upon the documents that Mr. Haug

24 has been pointing to that have led him to this new defense.

25        THE COURT:  Okay.

1       MR. BARRETT:  And by that I mean Mr. Franklin's --

2   this started off, Your Honor, with the FDA letter which they

3   got a long time ago where they learned all about this.  Now

4   they've -- I think we've made the point in our brief and I

5   won't push it again here, that they didn't learn anything new

6   here from Mr. Franklin's complaint.  But Mr. Franklin did file,

7   and it's attached to Mr. Amundson's affidavit, a summary of his

8   allegations.  Now it doesn't look like Mr. Franklin wrote -- it

9   looks very much like a lawyer-written document that Mr.

10  Franklin then agreed to.  But if you look at it, he does talk

11  about the various activities that he thinks that salesmen for

12  Warner Lambert were doing some bad things about.  And he

13  specifies them.  And none of them have anything to do with the

14  particular diseases that we indeed have highlighted as being

15  the treatment of neuro-degeneration.

16      You know, in response to Mr. Haug's suggestion that -- our

17  expert in this case has gone through and found out that doctors

18  have been prescribing this drug for treating neuro-

19  degeneration.  And the data from surveys has shown a certain

20  percentage of sales.  So I -- it seems to fly in the face of

21  Mr. Haug saying that this drug has no utility.  It just doesn't

22  seem to -- the two can't seem to exist in the same arena.  And

23  if he wants to push this utility argument with respect to a

24  validity, like Your Honor suggested, I think that makes sense.

25  But to try to tie it into infringement seems to be -- fly in

1   the face of the fact that if there are -- if, in fact, he is

2   correct and there's no utility, then we will not be able to

3   prove any infringing uses.  And there should be no problem for

4   Mr. Haug in that regard.

5       I -- any other questions I could field from Your Honor?  I

6   think it's important that -- I don't want to go back to the

7   fact that they had an opportunity in the earlier case to get

8   into this unclean hands defense.  And our suggestion that this

9   is an afterthought that they didn't think of -- I think it's

10   clearly an afterthought.  But I don't think Your Honor is gonna

11   rule on that.  I don't think he needs to use that as a handle

12   on which to decide whether or not to produce these documents.

13       But it's important -- Mr. Haug is wrong when he says these

14   are two separate cases.  These were almost one case.  We had

15   asked Your Honor to consolidate these two cases.  They are

16   identical subject matter in every way.  The infringement

17   allegations, the patent invalidity allegations are identical in

18   each case.  One product accused is a capsule, one is a tablet.

19   Most often those kinds of things are in one case.  This

20   happened to be in two cases.  It wasn't consolidated.  But it

21   wasn't consolidated with the understanding that the kind of

22   discovery that was gonna be used, and going to be completed in

23   the tablet case, and the extra time that it was gonna go on,

24   was going to be a little bit of clean-up discovery to clean up

25   the very narrow issues that made that case differently.  I'm

1   really sort of getting into the second aspect of our motion,

2   Your Honor --

3          THE COURT:  All right, we'll continue --

4          MR. BARRETT:  -- which is almost defending why we

5   always seem to be under the gun here as not having provided

6   discovery to PurePac.  So maybe I ought to hold off on that.

7          THE COURT:  Mr. Haug, anything further?

8          MR. HAUG:  Just one last comment.  And maybe it's just

9   a period on this.  We have been here many times over -- it's

10  going on -- I don't want to tell you how long we've been at

11  this, but it's almost two and half full years.  We've been to

12  the Court many times asking for this, that and the other thing.

13  In this instance I really -- PurePac is of the view that this

14  goes to the heart of their infringement case and this issue's

15  not going to go away.  And regardless of the ruling, it's going

16  to rear its head again as we head towards trial.  And it's

17  going to continually be argued at trial.  And I don't know

18  where it's gonna go from there.

19         And I would leave the Court with this.  I am looking ahead

20  to the opening or closing arguments to a jury or Court, Judge.

21  And on the one hand, Warner Lambert is going to be saying the

22  evidence, the circumstantial evidence shows that PurePac is

23  actively aiding and abetting infringement because they're

24  putting a drug into commerce based on an approval from the FDA.

25  And whether they do anything more or not, and even though they

30

1  wrote a letter to the entire industry saying, "Don't prescribe

2  it for anything but for what it's approved," they're still

3  guilty of intentional infringement.  That's what they will

4  argue based on the circumstantial evidence they present.

5       I believe PurePac must be able to defend itself and say

6  apart from denying those allegations, the jury or Court must

7  also consider how that market was created and what Warner

8  Lambert had to do with it.  And they made a conscious decision

9  to create that market, enhance that market, and now they're

10 using their patent to further that monopoly they already have

11 and to keep generic competition off for as long as they

12 possibly can.  That's what this case is all about.  Thank you,

13 Your Honor.

14      THE COURT:  Okay, thank you.

15      MR. BARRETT:  Your Honor, I need to make one point

16 that I promised Ms. Smith, who isn't here today, that I would

17 make in this argument.  I had forgotten before.  But it ties in

18 perfectly here.  And that is that Mr. Haug is saying that what

19 he needs is this group of documents.  And that's all Your Honor

20 has to rule on, a simple little group of documents, all been

21 collected.  And that's all they need and the matter is put to

22 rest.  This group of documents was generated and collected back

23 in 1996.  If Mr. Haug is serious about pursuing this defense

24 and he's allowed to do it, he's gonna need an update of those

25 documents.  He's gonna need to go and get all of the current

1    documents to show that we are currently doing what he's being

2    accused of infringement.  Something we did three or four years

3    ago, if we're not doing it now, doesn't make much relevance

4    anyway, even under his theory.  So I'm simply suggesting that

5    this is simply the tip of the iceberg, opening the Pandora's

6    box, however we want to phrase it.  It really is more than Mr.

7    Haug is suggesting, Your Honor.  Thank you.

8         THE COURT:  All right, thank you.  As counsel know,

9    this particular application seeks the production of documents

10   from a third party custodian of material relating to the

11   exploration by the FDA and potentially material relating to a

12   private lawsuit which in Defendant's view would indicate that

13   the Plaintiff has engaged in improper conduct in promoting the

14   off label use of the drug, Neurontin.  Defendant contends that

15   the production of this material will support and establish an

16   unclean hands defense by demonstrating that the Plaintiff has

17   engaged in inequitable behavior in connection with the

18   promotion of this off label usage of its product.  In

19   particular, Defendant contends that since Plaintiff's patent is

20   a method patent, which is only violated by use of Neurontin to

21   treat neuro-degenerate -- is that the correct pronunciation --

22        MR. HAUG:  Neuro-degenerative.

23        THE COURT:  -- neuro-degenerative diseases, that the

24   Plaintiff's alleged improper promotion of that off label market

25   should bar it from asserting its rights under the patent

1  against the Defendant.   Defendant further claims that since it

2  is Plaintiff's theory that any sale of Neurontin by the

3  Defendant would necessarily, at least in part, result in its

4  use by practitioners in a manner which violates the patent,

5  because of the manner in which Plaintiff has promoted its off

6  label use, that it's particularly appropriate to apply the

7  doctrine of unclean hands.

8      Plaintiff relies on the Supreme Court's decision in

9  Keystone Driller Company vs. General Excavator Company, 290

10  U.S. 240 {paren.} (1933) {closed paren.} to support its

11  contention that the unclean hands doctrine applies in this

12  context.   This Court is not persuaded.   PurePac has cited no

13  cases which are factually analogous to that before the Court.

14  It is indeed clear that there are no cases which applied this

15  doctrine to circumstances which are even close to that

16  presented in this matter.

17      As noted by the Court in Republic Molding Corporation vs.

18  BW Photo Utilities, reported at 319 Fed. 2nd 347, 9th Circuit,

19  1963, {quote} "Where unclean hands has been asserted to bar a

20  claim of infringement, it has usually been because the patent

21  was fraudulently obtained (citations omitted) or there had been

22  a concealment of evidence amounting to a fraud on the Court

23  (citation omitted) or perhaps more remotely the patent was

24  being misused as for example in violation of the Sherman Act."

25  This particular scenario fits into none of those categories.

1   And indeed as the Court in <u>Keystone Driller</u> noted, {quote}

2   "What does seem clear" -- I'm sorry, strike that quote and

3   instead refer to <u>Republic Moldings Corporation vs. BW Photo</u>

4   <u>Utilities</u>.  {Quote} "What does seem clear is that misconduct in

5   the abstract, unrelated to the claim to which it's asserted as

6   a defense, does not constitute unclean hands.  The concept

7   invoking the denial of relief is not intended to serve as a

8   punishment for extraneous transgressions, but instead is based

9   upon considerations that make for the advancement of ripe

10  injustice.  What is material is not that the Plaintiff's hands

11  are dirty, but that he dirtied them in acquiring the right he

12  now asserts or that the manner of dirtying renders inequitable

13  the assertion of such rights against the Defendant.  As

14  Professor Chaffee suggests, we should not by this doctrine

15  create a rule comparable to that by which a careless motorist

16  would be able to defend a subsequent personal injury suit by

17  proving that the pedestrian had beaten his wife before leaving

18  his home."

19      This Court finds that the assertion of an unclean hands

20  defense under the circumstances contended by Defendant indeed

21  amounts to an assertion which is similar to that involving the

22  careless motorist.  There is no assertion here that the patent

23  was attained by improper means or means which constitute a

24  basis for finding unclean hands.  There is no assertion here

25  that this litigation before the Court involves such conduct.

1   All that exists is an assertion that the Plaintiff in the

2   course of marketing its product in Defendant's view has

3   violated guidelines and procedures issued by the FDA

4   controlling the manner in which products may be promoted for

5   off label usage.

6       It is rather clear to the Court, from prior proceedings

7   before it, that that particular area is at a minimum a rather

8   arcane and difficult area of law.  It does not strike the Court

9   that whether or not Plaintiff has been able to properly

10   navigate that particular thicket constitutes a basis for

11   determining whether or not its patent should or should not be

12   enforced in this matter.

13       It is Defendant's contention that Plaintiff's overall

14   theory has substantial problems, since in effect, as I

15   understand it, Defendant is contending that Plaintiff asserts

16   contributory or reducing infringement regardless of whether or

17   not the Defendant has any intention of engaging in such

18   conduct.  That may very well be a litigable issue.  But what is

19   not a litigable issue is whether or not the off label promotion

20   involved in the FDA proceedings has any relevance to this

21   lawsuit.  For those reasons, the Court will deny Defendant's

22   application to compel the documents in question.  Let's proceed

23   to your next claims, which I think we can move along a little

24   bit quicker on.

25       MR. AMUNDSON:  Good morning, Your Honor.  The next

John J. Francis, Jr.
Michael C. Zogby
DRINKER BIDDLE & REATH LLP
*A Delaware Limited Liability Partnership*
500 Campus Drive
Florham Park, New Jersey 07932
(973) 360-1100
*Attorneys for Plaintiffs*
*Pfizer Inc., Warner-Lambert Company LLC,*
*Gödecke GmbH, and Pfizer Pharmaceuticals LLC*

Of Counsel:
Jack B. Blumenfeld
Karen Jacobs Louden
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re Gabapentin Patent Litigation _____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | MDL No. 1384<br>Master Docket No.<br>00-CV-2931 (FSH)<br><br>**This Filing Applies To:**<br>  Teva Defendants<br>    C.A. No. 00-CV-4168 (FSH)<br>    C.A. No. 00-CV-4589 (FSH)<br><br>  IVAX Defendants<br>    C.A. No. 00-CV-6073 (FSH)<br>    C.A. No. 01-CV-0193 (FSH)<br>    C.A. No. 01-CV-1537 (FSH)<br><br>  Eon Defendants<br>    C.A. No. 01-CV-2194 (FSH) |

**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION TO STRIKE CERTAIN**
**AFFIRMATIVE DEFENSES OF TEVA, IVAX, AND EON DEFENDANTS**

THIS MATTER having been brought before the Court by application of plaintiffs Pfizer Inc., Warner-Lambert Company LLC, Gödecke GmbH, and Pfizer Pharmaceuticals LLC ("Plaintiffs"), for an Order granting Plaintiffs' Motion to Strike Certain Affirmative Defenses of Teva, IVAX, and Eon Defendants; and the Court having considered all papers submitted herewith, including the accompanying Memorandum of Law and Declaration of John J. Francis, Jr.; and for good cause shown,

IT IS on this ___ day of _____, 2008, hereby

ORDERED THAT the Fourth Affirmative Defense of Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd. (collectively, "Teva") of unclean hands and Fifth Affirmative Defense of patent misuse are hereby stricken from Teva's Answer to Plaintiffs' First Amended and Supplemental Complaint in C.A. No. 00-CV-4168 (FSH) and C.A. No. 00-CV-4589 (FSH) under Fed. R. Civ. P. 12(f);

IT IS FURTHER ORDERED THAT the Fourth Affirmative Defense of Zenith Laboratories, Inc. (now known as IVAX Pharmaceuticals NV, Inc.), Zenith Goldline Pharmaceuticals, Inc. (now known as IVAX Pharmaceuticals, Inc.), and IVAX Corp. (collectively, "IVAX") of unclean hands and Fifth Affirmative Defense of patent misuse are hereby stricken from IVAX's Answer to Plaintiffs' First Amended and Supplemental Complaint in C.A. No. 00-CV-6073 (FSH), C.A. No. 01-CV-0193 (FSH), and C.A. No. 01-CV-1537 (FSH) under Fed. R. Civ. P. 12(f); and

IT IS FURTHER ORDERED THAT the Fifth Affirmative Defense of Eon Labs Manufacturing, Inc. (now known as Eon Labs, Inc.) and Sandoz, Inc. (collectively, "Eon," and together with Teva and IVAX, "Defendants") of unclean hands is hereby stricken from Eon's

Answer to Plaintiffs' First Amended and Supplemental Complaint in C.A. No. 01-CV-2194

(FSH) under Fed. R. Civ. P. 12(f).


_____
FAITH S. HOCHBERG, U.S.D.J.


2369457.1